MELROSE PARK NATIONAL BANK, as Trustee, Plaintiff-Appellee, v. CAPITOL BANK & TRUST, Defendant-Appellant.

Second District No. 2—88—0717

Opinion filed March 7, 1989.

Joel A. Stein, of Laser, Schostok, Kolman & Frank, of Chicago (Melbourne A. Noel, of counsel), for appellant.

Ralph L. Dichtl, of Wheaton (Lloyd E. Dyer, Jr., of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Machinery and materials in which defendant, Capitol Bank & Trust, held a security interest were left on the plaintiff's property by tenant National Renovations, Inc. (National), which declared bankruptcy. Plaintiff, Melrose Park National Bank, as trustee, sued defendant to recover rental charges, cleanup costs, utilities, and fixtures allegedly wrongfully removed from the property. The trial court awarded plaintiff $21,403.06 in damages. This appeal followed. We reverse and remand for further proceedings.

On July 31, 1986, in the circuit court of Cook County, plaintiff, as trustee under trust No. 282, and the holder of legal title to the commercial property at 742 Factory Road, Addison, Illinois (property), was granted an order of possession in a forcible proceeding against the tenant, National, a concern that renovated auditorium seats. This order of possession was stayed until August 14, 1986. On August 12, 1986, National filed a bankruptcy petition under chapter 7 of the

United States Bankruptcy Code (11 U.S.C.A. §101 *et seq.* (West 1979)). Said filing immediately invoked the automatic stay provision of the Bankruptcy Code. (11 U.S.C.A. §362(a)(3) (West 1979).) National had borrowed money from defendant during 1985 and had signed security agreements in favor of said defendant covering all of National's equipment, inventory, and accounts receivable. Defendant had perfected its security interests in National's accounts receivable, goods, equipment, furniture, fixtures, etc., by filing Uniform Commercial Code (UCC) financial statements with the Secretary of State and the recorder of Du Page County in June 1985. National ultimately defaulted on its loan payments to defendant, as well as its rent payments to plaintiff.

Plaintiff never sought to modify the automatic stay imposed by National's bankruptcy petition. On September 10, 1986, defendant filed a motion to modify the bankruptcy stay. The bankruptcy court granted said motion on October 10, 1986. The modification order permitted defendant to foreclose on its security interest in National's "accounts receivable, notes, goods, inventory, equipment, furniture, fixtures, general intangibles, jigs, tools, dyes and molds." Later in October 1986, an order was entered by the bankruptcy court allowing the bankruptcy trustee to abandon its interests in National's assets. Defendant conducted a UCC sale on November 25, 1986, selling reusable equipment and inventory to bidders at the sale. Those items not purchased at the sale were then sold the following week to National's president, Shirley Gardner. No rent was paid to plaintiff by any party from August 1986 through the end of the year.

In the plaintiff's case, George Guerine (George) testified that he was a semiretired attorney who is a beneficiary of Melrose Park National Bank trust No. 282, which holds title to the disputed property. The remaining beneficial owner of the property is the Guerine Trust. National took possession of the property two or three days before the scheduled beginning of the lease term, *i.e.,* January 1, 1985, and continued in possession until sometime in July 1986, when George caused a five-day notice to be served upon it for the nonpayment of overdue rent. In a phone call to George, National's attorney stated that National was unable to pay rent and that he was about to file a bankruptcy proceeding on its behalf. In the circuit court of Cook County, George filed a forcible entry and detainer suit in July, and he obtained an order for possession of the property dated July 31, 1986. This order was stayed until August 14, 1986.

On August 14, 1986, George and his nephew, Guy Guerine (Guy), entered the property and took possession of it. Guy (an employee of

both Guerine & Company, which owns and operates a mobile home park, and the Guerine Trust, one of the beneficiaries of plaintiff trust No. 282) was responsible for maintaining and overseeing the Addison property. Upon entering the property, George observed both refuse and machinery in the building and a truck tractor and trailer outside the building. George next returned to the property sometime in November 1986, when he met with defendant's representatives. He told them that defendant would have to pay rent if it wanted "to stay there." One of defendant's representatives stated, "Yes, we have to pay rent." Further, George told them that defendant should pay what the prior tenant had paid, i.e., $5,000 a month. Defendants never made any rent payments, and George sent a letter of notice to defendant sometime in November, demanding that it vacate the property.

On cross-examination, George admitted that he did not know who brought onto the property the material which he had observed when taking possession of the building in August 1986. He obtained copies of National's bankruptcy petition after he had filed his forcible proceeding against the company. He did not know when the bankruptcy petition was filed. George had been told by the bankruptcy trustee that the latter's interest in the property would be abandoned. George did not know exactly when the trustee abandoned the property. He never moved to modify the automatic stay imposed by the Bankruptcy Code. None of the defendant's representatives ever agreed to pay any specific amount of rent.

Guy Guerine then testified that he was employed by the Guerine Trust to manage its properties, including the Addison property; that he had negotiated the lease with National; and that prior to National moving in, the property had been cleaned and was in good condition. National moved out of the building in July 1986. At or about the end of July 1986, Guy drilled the locks out of the building, entered it, and changed the locks "with the permission of the court." On entering the building, Guy observed a baking oven, a conveyor system, an air compressor, a paint spray booth, portable tools, and drills. He also noted large numbers of auditorium seats in various states of reconditioning. Outside the building stood a semitractor and trailer. Guy was in charge of cleaning the premises after the tenant left; he hired employees from Guerine & Company to perform various janitorial tasks. Most of the refuse was hauled away in dumpsters by Browning-Ferris Industries. A representative of defendant asked Guy to provide electricity to the building during the UCC sale. He complied and received bills for the electricity used.

Guy recalled a late October 1986 meeting at which George and he met with defendant's representatives, Joel Stein and Robert Jones. Stein agreed that if defendant were to leave the security items on the property, it would have to pay rent. No specific dollar amount was established.

Subsequent to that meeting, the overhead oven, conveyor system, air compressor, paint spray booth, and other items were sold and removed from the premises by the buyers. Plaintiff had nothing to do with this sale, but plaintiff, commencing in December 1986, cleaned up the premises, which was completed in March 1987.

Defendant's auctioneer had the electricity turned on in the building during the month of November. Thereafter, the electricity was kept on in order to facilitate cleaning the premises.

On cross-examination, Guy stated that defendant did not bring anything onto the property and that the refuse on the property had been put there by National. He also admitted that during August, September, and October 1986, he had total control of the property.

Robert Jones, a loan officer with defendant, was called as an adverse witness by the plaintiff. In connection with his employment, Jones had made loans to National. He authorized the hiring of an auctioneer for the purpose of conducting an auction of National's secured property. The auction's proceeds were applied to the unpaid balance of National's loan with defendant. Defendant did not pay for any refuse service or any cleanup expenses of the property.

Jones was on the property three times in June 1986. Following National's abandonment in July 1986, Guy let him into the property on two occasions, and on the third occasion, the auctioneer was there with a key to the premises. On cross-examination, Jones stated that no one had ever given him a key to the property and that, to his knowledge, nobody from the bank had ever brought any refuse onto the property. Jones stated that the unpaid loan to National in July 1986 had an approximate balance of $277,000 and was secured by all of National's assets.

Jones then testified on defendant's behalf and stated that he did not enter the property after National filed for bankruptcy and that he did not have any meetings on the premises until October 29, 1986. By that time, plaintiff had taken possession of the building. The meeting of October 29 had not taken place earlier because National's bankruptcy petition prevented defendant from going onto the property. Defendant moved the bankruptcy court to modify the Code's automatic stay provision for purposes of asserting its interest in the secured items. It obtained an order to do so on October 10, 1986.

Jones never indicated to Guy that the defendant would pay rent. Defendant did not give anyone authority to enter into such an agreement. On October 29, 1986, Jones observed that the defendant's collateral occupied only about a quarter of the property. After the end of November, the defendant did not claim any interest in any materials still located on the premises. Jones did not recall ever asking Guy to permit defendant to continue keeping its collateral on the property.

Jones stated that defendant did not conduct the UCC sale until November 25, 1986, because it could not get into the premises any sooner, due to the automatic stay of the bankruptcy. Also, time was needed to notify people of the sale.

On the theory of *quantum meruit*, the trial court found for plaintiff; it found defendant had the benefit of storing the equipment and other materials on the site from August through November 1986, and held that defendant was liable for $14,790 in rent. Also, the trial court determined that defendant was liable for $6,297 in cleanup costs and $316 in utilities.

On appeal, defendant argues that the trial court erred in awarding plaintiff rental and cleanup damages.

Initially, defendant argues that provisions of the Bankruptcy Code prevented it from taking possession of the property during part of the period for which it was charged with rent. Section 362(a)(3) of the Code provides:

> "Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title *** operates as a stay, applicable to all entities, of—
>
> * * *
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate ***." (11 U.S.C.A. §362(a)(3) (West 1979 & Supp. 1988).)

Defendant maintains that when National filed a chapter 7 petition on August 12, 1986, said action invoked the automatic stay provision in the Code. Defendant then cites a number of cases in which the Federal courts have liberally interpreted the scope of the automatic stay. *In re Computer Communications, Inc.* (9th Cir. 1987), 824 F.2d 725 (partner of bankrupt debtor in a joint marketing and development agreement violated automatic stay by unilaterally terminating contract with debtor); *In re Whitt* (Bankr. E.D. Pa. 1987), 79 Bankr. 611 (tenant debtor protected by automatic stay from eviction by old landlord even if she has moved to different premises from the one in which she resided at the onset of the case).

Defendant contends that, under the case law, once National's bankruptcy petition was filed on August 12, 1986, neither plaintiff nor defendant had any right to take possession of the property or the machinery and items contained therein. Defendant maintains that only after the bankruptcy court granted defendant's motion to modify the automatic stay on October 10, 1986, could it legally begin foreclosing on its security interest in National's assets. Further, defendant asserts that only after the bankruptcy trustee abandoned his interest in National's assets in late October 1986 did plaintiff have any right to take control over the secured property. Thus, defendant argues that it cannot be liable for rent in the months it was unable to take possession of its security interests, namely, September and October 1986.

Moreover, defendant argues that it is logically impossible under the doctrine of *quantum meruit* to predicate a lender's liability for rent on nothing more than the presence within the leased premises of a debtor's goods, which are not owned by the lender and which cannot be dealt with in any manner without violating bankruptcy law.

Further, defendant contends that the case relied upon by the trial court, *Elliot v. Villa Park Trust & Savings Bank* (1978), 63 Ill. App. 3d 714, does not support the instant rent award. First, the *Elliot* court found the secured lender liable only for "storage charges," not the rent. Second, the *Elliot* court found that the lender had invoked its security interest in the debtor's machine shop equipment prior to the debtor's bankruptcy petition and after the debtor had terminated his lease with plaintiff. Defendant argues that none of the Code's obstacles to the creditor's and landlord's efforts to obtain possession which arose in the present case existed in *Elliot*.

In response, plaintiff argues that the facts of *Elliot v. Villa Park Trust & Savings Bank* (1978), 63 Ill. App. 3d 714, are remarkably similar to the instant case. Plaintiff maintains that all facts relied upon by the *Elliot* court to create an implied contract are present here. Plaintiff points out that from the beginning of August 1986, defendant made it clear that it intended to assert its security interest in the property and to deal with the debtor's property as its own. Further, defendant's agents and employees entered the property from time to time, possessed a key to the building, and used the building to conduct an auction. Plaintiff maintains that all of the facts relied on by *Elliot* to create an implied contract are present in this case.

Further, plaintiff argues that it had already completed forcible proceedings in State court and judgment had been entered in July 1986, terminating National's possession rights. Thus, plaintiff concludes that when the bankruptcy petition was filed on August 12,

1986, National had no interest in property that was subject to the automatic stay provisions.

Initially, we note that the property was subject to the Code's section 362(a)(3), the automatic stay provision. Though plaintiff obtained a forcible judgment on July 31, 1986, the State court stayed that judgment until August 14, 1986. National's bankruptcy petition was filed on August 12, 1986; thus, an automatic stay was in effect before the forcible judgment took effect. Until the bankruptcy court modified the automatic stay, plaintiff was prevented from taking control of the property and defendant was prevented from taking control of the secured items on the property.

■ Under these circumstances, the only appropriate damages that could be awarded under a *quantum meruit* theory are the *storage and the electricity costs* incurred by defendant which defendant agrees to pay. (*Elliot*, 63 Ill. App. 3d at 717-18.) Rental damages would be thoroughly inappropriate under these facts, which demonstrate that defendant never had control over the property from August to the end of November 1986. Guy Guerine admitted that plaintiff controlled the property from August through October 1986. Defendant's agents were only allowed on the property to prepare for and to conduct the November 25, 1986, UCC sale of the secured items on the property.

Moreover, rather than seeking to modify the automatic stay so that it could regain possession of the property as quickly as possible and make preparations for its rental to a new tenant, plaintiff did nothing. As early as mid-August 1986, plaintiff could have moved the bankruptcy court for permission to remove defendant's secured items from the property, paving the way to finding a new tenant. It is unlikely the bankruptcy trustee would have opposed such a motion since it had abandoned its interest in National's assets in October 1986. Additionally, plaintiff took upwards of three months to clean the property following the UCC sale. This indicates that plaintiff was in no particular hurry to find a tenant to replace National.

■ Having failed to avail itself of routine measures to mitigate the consequences of the tenant's bankruptcy, the plaintiff is unpersuasive in arguing that it held the property from September to November solely for the benefit of the defendant. Furthermore, plaintiff's argument that, at the defendant's request, it did not rent to another tenant is not supported by the record.

■ Defendant's September 10, 1986, motion to modify the stay so that it could assert its security interest in the items on the property was granted on October 10, 1986. We find that the earliest possi-

ble date which defendant could have begun to foreclose on its security interest was October 11, 1986. Therefore, the appropriate date from which to calculate defendant's storage costs is October 11, 1986, the first date on which defendant could have begun asserting its possession of the secured items. The storage costs concluded November 30, 1986, at which point defendant had sold or removed all secured assets from the property. On remand, the trial court shall hold proceedings to determine the proper value of said storage costs for this 1²/₃-month period.

Defendant next argues that it did nothing to incur the cleanup costs awarded by the trial court. Defendant maintains that the award of $6,297 was not based on any factual findings and that the trial court disregarded the evidence as to ownership of the refuse.

Defendant points out that the defendant's primary witness, Robert Jones, established that defendant sold all remaining assets after the UCC sale to Shirley Gardner, National's president. The evidence, states defendant, clearly demonstrates that any refuse on the property after early December 1986 did not belong to defendant, which never claimed a security interest in the refuse but belonged instead to National and the foreclosure sale purchasers, notably, Shirley Gardner, an officer of National.

■ Upon careful review of the record, we find no evidence to support the trial court's award of cleanup damages. The refuse cleanup was the function of plaintiff as landlord. National's security deposit of $4,930 was intended to cover such costs. Moreover, the idea that defendant was in any way responsible for the presence of the refuse on the property finds no support in the record. Guy Guerine admitted that defendant did not bring any of the refuse onto the property. Consequently, we find that the trial court erred in granting any damages for refuse removal and cleanup of the property, which were plaintiff's responsibilities.

For reasons stated above, we reverse the judgment of the trial court and remand this cause of action for further proceedings consistent with this opinion.

Reversed and remanded.

LINDBERG and McLAREN, JJ., concur.